IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Upper Merion Township VFD, | : | |
| Petitioner | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| James Dolga c/o Therese Dolga | : | |
| (Workers' Compensation Appeal | : | |
| Board), | : | No. 1638 C.D. 2024 |
| Respondent | : | Argued: October 7, 2025 |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                                        FILED: November 3, 2025

Upper Merion Township (Township) VFD (Employer) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) November 8, 2024 order affirming the WC Judge's (WCJ) decision that granted Therese Dolga's (Claimant) Fatal Claim Petition for Compensation by Dependents of Deceased Employees (Fatal Claim Petition). Employer presents three issues for this Court's review: (1) whether the Board erroneously held that lay testimony was sufficient to satisfy Claimant's burden of proof, where Section 301(f) of the WC Act (Act)[1] requires that any volunteer firefighter claim shall be based on evidence of direct exposure to a carcinogen as documented by reports filed pursuant to the Pennsylvania Fire Information Reporting System (PennFIRS); (2) whether the

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, added by Section 2 of the Act of July 7, 2011, P.L. 251, No. 46, 77 P.S. § 414 (requires volunteer firefighters to provide evidence of direct exposure to carcinogens as documented by reports filed pursuant to the Pennsylvania Fire Information Reporting System).

WCJ's decision that Claimant established an entitlement to fatal claim benefits due to the death of her husband, volunteer firefighter James Dolga (Decedent), from adenocarcinoma of the esophagus pursuant to the firefighter cancer presumption provisions in Sections 301(c)(2), 108(r) and 301(f) of the Act[2] is supported by competent evidence and pertinent authority; and (3) whether the Board erroneously affirmed the WCJ's one-sentence finding overruling numerous preserved objections with no explanation or analysis. After review, this Court affirms.

Decedent served as a volunteer firefighter from 1974 to 2019. In September 2019, he was diagnosed with metastatic esophageal cancer, which ultimately caused his death on April 3, 2020. On July 1, 2021, Claimant filed the Fatal Claim Petition pursuant to Section 108(r) of the Act, alleging that Decedent's cancer resulted from his volunteer firefighting duties and seeking dependency benefits. On August 5, 2021, Employer filed an answer denying the material allegations of the Fatal Claim Petition.[3]

The WCJ held hearings on August 3, September 14, and November 9, 2021, February 15, May 17, and September 27, 2022, and March 21, 2023. On September 21, 2023, the WCJ granted Claimant's Fatal Claim Petition. In doing so, the WCJ accepted Claimant's and Mark Leszczynski's (Leszczynski)[4] testimony, which established that Decedent had served as a volunteer firefighter from 1974 through 2019, as credible and persuasive. The WCJ further found that Decedent's incident responses with Swedesburg Fire Company for the years 2017, 2018, and 2019 were sufficient to fulfill the PennFIRS reporting requirements of Section 301(f)

---

[2] 77 P.S. § 411(2). Section 108(r) of the Act was added by Section 1 of the Act of 1972, Oct. 17, P.L. 930, 77 P.S. § 27.1(r).

[3] On December 14, 2021, the WCJ issued an order excusing the untimeliness of the answer due to issues in the mail that caused a delay in the Township's receipt of the Fatal Claim Petition.

[4] Leszczynski has known Decedent since they were children and he served as a volunteer firefighter with Decedent from 1974 to 2004. *See* Certified Record, Item 22 at 6.

of the Act. The WCJ also found the opinion of Claimant's expert, Tee Guidotti, M.D. (Dr. Guidotti), a licensed physician with a master's degree in public health and toxicology credentials, to be more credible and persuasive than Employer's expert, David Goldsmith, Ph.D. (Dr. Goldsmith), an epidemiologist. Significantly, the WCJ found that the basis of Dr. Goldsmith's opinion that Decedent was a volunteer firefighter and had the option not to respond was of no consequence in light of Leszczynski's uncontradicted testimony establishing that, prior to 2004, Decedent responded to between 200 and 300 calls per year, 60% of which involved some type of fire. Relying on Dr. Guidotti's testimony, the WCJ concluded that Decedent's cancer was a type which was possibly caused by exposure to a carcinogen recognized by the International Agency for Research on Cancer (IARC) as a Group 1 carcinogen as outlined by Section 108(r) of the Act. Employer appealed to the Board, which affirmed the WCJ's decision on November 8, 2024. Employer appealed to this Court.[5]

Preliminarily,

"it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Columbia Cnty. Comm'rs v. Rospendowski (Workers' Comp. Appeal Bd.)*, 286 A.3d 436, 446 (Pa. Cmwlth. 2022). [This Court] review[s] the entire record to determine if it contains evidence a reasonable mind might find sufficient to support the WCJ's findings and if the record contains such evidence, the findings must be upheld even though the record contains conflicting evidence. *Id.* This inquiry requires that [this Court] "view the evidence in the light most favorable to the prevailing party and give [that party] the

---

[5] "[This Court's] review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed[,] or whether constitutional rights were violated." *Bristol Borough v. Workers' Comp. Appeal Bd. (Burnett)*, 206 A.3d 585, 595 n.6 (Pa. Cmwlth. 2019) (*en banc*).

3

benefit of all inferences reasonably deduced from the evidence." *Id*.

*Mercer v. Active Radiator MPN, Inc. (Workers' Comp. Appeal Bd.)*, 317 A.3d 681, 698-99 (Pa. Cmwlth. 2024).

Employer first argues that the Board erroneously held that lay testimony was sufficient to satisfy Claimant's burden of proof, where Section 301(f) of the Act requires that any volunteer firefighter claim shall be based on evidence of direct exposure to a carcinogen as documented by reports filed pursuant to PennFIRS. Specifically, Employer contends that Claimant failed as a matter of law to sustain her burden of proof because her claim was not *based on* evidence of exposure to carcinogens as documented in PennFIRS reports. Employer insists that Claimant failed to prove that the incident response list was compiled using data submitted to PennFIRS or even that Employer was a participant in PennFIRS. Moreover, Employer emphasizes that the incident response sheet only covered 23 fire responses over 2.5 years. Employer asserts that Section 301(f) of the Act mandates that *any* claim arising out of a volunteer firefighter's cancer *shall be based on* PennFIRS reports and, here, both the WCJ and the Board based their decisions on lay testimony of exposure.

Initially, Section 301(f) of the Act provides, in relevant part:

> Any claim made by a member of a volunteer fire company shall be based on evidence of direct exposure to a carcinogen referred to in [S]ection 108(r) [of the Act] **as documented by reports filed pursuant to the [PennFIRS]** and provided that the member's claim is based on direct exposure to a carcinogen referred to in [S]ection 108(r) [of the Act].

77 P.S. § 414 (emphasis added).

In *Bristol Borough v. Workers' Compensation Appeal Board (Burnett)*, 206 A.3d 585 (Pa. Cmwlth. 2019) (*en banc*), when faced with the identical argument

4

that Section 301(f) of the Act requires that a volunteer firefighter use *only* PennFIRS documentation to establish direct exposure to a Group 1 carcinogen, this Court explained:

> In reviewing the language of Section 301(f) [of the Act], [this Court] recognize[s] that it imposes the same general causation requirement on both career and voluntary firefighters to establish "direct exposure to a carcinogen referred to in [S]ection 108(r) [of the Act]." 77 P.S. § 414. Notably, Section 301(f) [of the Act] does not require career firefighters to identify and document the carcinogens encountered at every incident. Rather, a career firefighter may establish direct exposure to a Group 1 carcinogen by evidence of his occupational exposure to fire smoke, soot, diesel exhaust, and other hazardous substances such as asbestos, and expert medical/scientific evidence identifying the Group 1 carcinogens present in those substances.

*Burnett*, 206 A.3d at 601-02. The *Burnett* Court concluded:

> It would be unreasonable to interpret the identical language in Section 301(f) [of the Act], which specifically applies to Pennsylvania's volunteer fire companies, as imposing a more technical and difficult reporting standard than that required for career fire departments. Common sense dictates that there are many volunteer fire companies across the Commonwealth that lack the resources that would be needed for the scientific identification and documentation of the Group 1 carcinogens encountered by their firefighters at each incident.

*Id*. at 602.

> The *Burnett* Court held:

> [I]n accord with our Supreme Court's recent interpretation in [*City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)*, 195 A.3d 197 (Pa. 2018),] of the respective evidentiary burdens imposed by Sections 108(r) and 301(f) of the Act, combined with the credible evidence presented in this case, [this Court] do[es] not interpret the reporting requirements in Section 301(f) [of the Act] as imposing such a disparate and

difficult burden on Pennsylvania's volunteer fire companies as that asserted by [the e]mployer.

*Burnett*, 206 A.3d at 602.

Here, the WCJ opined:

Th[e WCJ] finds that [Exhibit] C-6[,] Decedent's Incident Responses for 2017, 2018[,] and 2019[,] with Swedesburg Fire Company fulfills the PennFIRS reporting requirement of Section 301([f]) [of the Act]. Claimant's counsel subpoenaed "any and all activity reports specific to [Decedent] thru [sic] fire software taken from reports from PennFIRS or any other type of fire reports/activity reports created by the Swedesburg [] Fire Company between 2000 to 2020." In response, reports were provided by [Employer's] Fire Chief. His Deposition Affidavit of Record Custodian certifies that the records are true and correct copies of the records in his custody pertaining to Decedent after a careful search. The lack of documentation of incident responses prior to 2017[,] is not the fault of Decedent. Decedent cannot produce records that do not exist. The incident responses for the years produced do not contradict the testimony of [] Leszczynski and [Employer] has not produced evidence to contradict [] Leszczynski's testimony of incidents to which he and Decedent responded.

WCJ Dec. at 16.

On appeal, the Board explicated:

Claimant subpoenaed the PennFIRS report from [Employer] and Exhibit C-6 is what [Employer] produced. Claimant's report documents Decedent's responses to calls during his final three years with [Employer]. To supplement the report and establish Decedent's exposures during the period prior to the final three years, Claimant presented the testimony of Decedent's co-worker, who served with Decedent at fire responses and provided direct knowledge of the numbers and types of incidences to which they responded. [] Leszczynski credibly testified that routinely, over the course of his service for [Employer], Decedent responded to fire calls, both interior and exterior, at which smoke and soot were present.

6

> Mindful of the guidance of *Sladek* and *Burnett*, [the Board] believe[s] the purpose of this provision was served.

Bd. Dec. at 22. This Court agrees. *See Lake Ariel Volunteer Fire Co. v. Rae (Workers' Comp. Appeal Bd.)* (Pa. Cmwlth. No. 92 C.D. 2024, filed Apr. 1, 2025)[6] (agreeing with the Board's conclusion that the purpose of the provision was served by the incident participation report that the employer provided, and the claimant's credible testimony); *Borough of Hollidaysburg v. Detwiler (Workers' Comp. Appeal Bd.)*, 328 A.3d 569 (Pa. Cmwlth. 2024) (concluding response reports satisfied the PennFIRS reporting requirement and that when combined with the claimant's and others' testimonies regarding claimant's exposure, the response reports were substantial evidence to support the WCJ's finding that the claimant showed direct exposure to a Group 1 carcinogen). Accordingly, the Board did not err by affirming the WCJ's finding that Section 301(f) of the Act does not require that a volunteer firefighter use *only* PennFIRS documentation to establish direct exposure to a Group 1 carcinogen.

Employer next argues that the WCJ's decision that Claimant established an entitlement to fatal claim benefits due to the Decedent's death from adenocarcinoma of the esophagus pursuant to the firefighter cancer presumption provisions in Sections 301(c)(2), 108(r) and 301(f) of the Act is not supported by competent evidence and pertinent authority. Specifically, Employer contends that the Board largely failed to address numerous evidentiary issues Employer raised on appeal, such as: (1) the WCJ basing her general causation finding on a single epidemiological study (the Glass Study), which determined that there was no statistically significant general causal link between firefighting and

---

[6] While not binding, unreported opinions of this Court issued after January 15, 2008, may be cited for their persuasive authority pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). *Rae* is cited for its persuasive value.

esophageal/kidney cancer; (2) the WCJ ignoring nearly a dozen other epidemiological studies which arrived at the same conclusion and ignored incontrovertible evidence of non-occupational causes like smoking and silica exposure - both of which are strongly linked to kidney and esophageal cancer, unlike firefighting; and (3) the WCJ finding, without evidence, that Decedent successfully passed a physical examination that failed to reveal the condition of cancer despite a prior kidney cancer diagnosis in 2013. Employer further asserts that the WCJ granted relief under Sections 301(f), 108(r), 301(c)(1), and 301(c)(2) of the Act without finding the specific carcinogen to which Decedent was exposed, whether firefighting actually caused Decedent's cancer, or whether kidney/esophageal cancer rates are higher among firefighters compared to the general population.

> Section 301(f) of the Act mandates, in relevant part:
>
> Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in [S]ection 108(r) [of the Act] relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer.

77 P.S. § 414. Section 108(r) of the Act defines the term "occupational disease" to include "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the [IARC]." 77 P.S. § 27.1(r).

> The Pennsylvania Supreme Court has instructed:
>
> Generally, reading the [above] sections together, the statutory framework for litigation of claims for [WC] benefits by firefighters afflicted with cancer proceeds in discrete stages. Initially, the claimant must establish that

he or she has an "occupational disease," as that term is defined in Section 108(r) [of the Act]. 77 P.S. § 27.1(r). Next, to establish an evidentiary presumption of entitlement to compensation in accordance with [S]ection 301(f) [of the Act], the claimant must establish that he or she

> (1) served four or more years in continuous firefighting duties;
>
> (2) had direct exposure to a Group 1 carcinogen; and
>
> (3) passed a physical examination prior to asserting a claim or prior to engaging in firefighting duties (and the examination failed to reveal any evidence of cancer).

77 P.S. § 414. Finally, if the claimant succeeds in demonstrating an occupational disease and an entitlement to the evidentiary presumption of compensability, then the burden of proof shifts to the employer, who must offer "substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting." *Id*.

*Sladek*, 195 A.3d at 207 (footnote omitted).

First, Employer's claim that the WCJ's discussions of the Glass Study implies that the WCJ believed the Glass Study found a statistically significant increased incidence or mortality of esophageal or kidney cancer amongst professional Australian firefighters, but not volunteer Australian firefighters, is simply not supported by the WCJ's decision. *See* Employer Br. at 45. The WCJ expressly found:

> Based on the literature and a weight of evidence analysis, the incidents and mortality ratio of esophageal cancer in the fire service probably varies by exposure. **The Niapses studies are the most reliable and showed a significant and robust increase**. Dr. Guidotti is of the opinion that the weight of that evidence is quite clear that esophageal cancer should be considered among the outcomes that may be related to exposure to [G]roup [1] carcinogens.

9

> Esophageal cancer like kidney cancer is related to IARC [G]roup [1] carcinogens.

WCJ Dec. at 9 (emphasis added).

The WCJ's discussion of the Glass Study was in reference to Employer's expert witness's testimony, which she did not find as credible or persuasive as Claimant's expert's testimony.[7] Specifically, the WCJ stated:

> [] Dr. Goldsmith cites the 2017 study of Glass of Australian firefighters. Dr. Guidotti notes that there is more than one study. He is most interested in the professional firefighters because that is where the intense exposure is. Dr. Guidotti has been to Australia and observed the firefighters, had numerous discussions with his colleagues there and was an advisor when the Glass [S]tudy was first put together. He also had a number of dealings with the United Firefighters of Australia and with people who were or are involved in the state level firefighting networks. He attended one of their national conferences.

> [] Dr. Guidotti notes that Dr. Goldsmith places a great deal of emphasis on the study of volunteer firefighters. Dr. Guidotti is of the opinion that a volunteer firefighter in Australia is completely different than a volunteer firefighter in an urban or suburban or semi-industrial area like [the] Township. Australian volunteer firefighters are essential to local fire suppression because they work in rural areas primarily where there are wildfires. This is significant because burning wood and burning vegetation

---

[7] The WCJ determined:

> Based upon a review of the testimonies of Dr. Guidotti . . . and Dr. Goldsmith . . . , th[e WCJ] finds that general causation has been established. Based on a review of the evidentiary record as a whole, th[e WCJ] further finds the testimony of Dr. Guidotti more credible and persuasive than any contrary testimony of Dr. Goldsmith. Accordingly, the testimony of Dr. Goldsmith is rejected wherever inconsistent with the testimony of Dr. Guidotti and the testimony of Dr. Guidotti is accepted as fact. The analysis of Dr. Guidotti is clear, logical and well supported.

WCJ Dec. at 15.

10

is much less of a problem than burning structures. The Australian urban firefighters look like professional firefighters anywhere although they are more attentive to personal protections.

WCJ Dec. at 10. Clearly, the WCJ was not indicating that her decision was based on the Glass Study.

Next, Employer claims that the WCJ ignored the epidemiological studies and other studies to which Dr. Goldsmith testified and ignored Dr. Goldsmith's evidence of non-occupational causes like smoking and silica exposure - both of which he stated were strongly linked to kidney and esophageal cancer.

> This Court has explained:
>
> Capricious disregard occurs when the fact[-]finder deliberately ignores relevant, competent, and "apparently trustworthy" evidence. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004). Our Supreme Court has held that the standard "is not to be applied in such a manner as would intrude upon the agency's fact-finding role and discretionary decision-making authority." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, . . . 812 A.2d 478, 487-88 ([Pa.] 2002).

*Mercer*, 317 A.3d at 694-95.

Here, the WCJ addressed Dr. Goldsmith's studies and conclusions in 22 separate paragraphs in her findings of fact. *See* WCJ Dec. at 12-15 (Findings of Fact No. 7(a)-7(v)). Based thereon, the WCJ concluded:

> Based on Dr. Goldsmith's assessment of the published epidemiologic literature, he was of the opinion that there was not a sufficient link for general causation between Decedent's cancers and his work as a firefighter. Dr. Goldsmith is of the opinion that the higher causal relationship link is smoking and silica exposure. However, he was also of the opinion that it is possible that Claimant's cancers could be caused by a Group 1 carcinogen from exposure as a firefighter. Both experts considered the same reports. Based on his review of the

11

epidemiology evidence, Dr. Goldsmith is of the opinion that a relationship between firefighting and esophageal or kidney cancer has not been established. His opinion was based on the fact that Decedent was a volunteer and[,] unlike a professional[,] had the option not to respond, that he fought few fires per year, 6 to 7, over the last 15 years of his career, and he had a 10[-]year history of smoking with probably a 30 [to] 40 pack a year habit.

The fact that Decedent had the option to respond is of no consequence. The uncontradicted testimony of [] Leszczynski establishes that[,] before 2004, he and Claimant responded to 200 [to] 300 runs a year, 60% of which involved some type of fire or smoke and [Exhibit] C-6 establishes that Claimant responded to more than a few and more than 6 [to] 7 fires in the last years of his firefighting service 2017, 2018[,] and 2019. Notably, the latency period for cancer is consistent with Claimant's most active period of firefighting. Dr. Goldsmith relied on studies of volunteer firefighters in rural settings that were much less similar to the type and frequency of firefighting performed by Decedent.

Additionally, Dr. Goldsmith acknowledged that Decedent's precise smoking history is unknown. Dr. Guidotti was involved in the Glass [S]tudies and his testimony establishes his familiarity with professional and volunteer firefighters in Australia. The testimony of [] Leszczynski as to the fires he and Decedent responded and [Exhibit] C-6 supports the opinion that their firefighting experience was more akin to a professional Australian firefighter than to an Australian volunteer firefighter.

Significantly, Dr. Goldsmith, an epidemiologist, cannot provide the requisite non-firefighting cause of Decedent's cancer once general causation has been established.

WCJ Dec. at 15-16. Clearly, the WCJ did not ignore any of Dr. Goldsmith's testimony, as she addressed his studies and opinions and explained her reasoning for not accepting them.

Employer further claims that the WCJ found, without evidence, that Decedent successfully passed a physical examination that failed to reveal the

condition of cancer despite a prior kidney cancer diagnosis in 2013. However, Dr. Guidotti testified:

> Q. Now in your review of the medical records, which are almost if not more than 1,000 pages, did [Decedent] have medical evaluations prior to being diagnosed with kidney cancer and prior to being diagnosed with esophageal cancer where it sort of didn't show that they were yet to be diagnosed?
>
> A. Yes, that's correct. He did not have a diagnosis of either cancer until it was clinically symptomatic.
>
> Q. It's an odd element of a firefighter cancer case in Pennsylvania that we have to be able to show that the firefighter had a physical evaluation before he was diagnosed with cancer that did not reveal the cancer. And what you're telling me is that you can state an opinion or a fact that your review of the medical records that there are multiple examinations that show that.
>
> A. Yes, that's correct.

Reproduced Record at 291a-292a. Because Decedent began working as a firefighter in 1974, and he was not diagnosed with kidney cancer until 2013, Dr. Guidotti's testimony is evidence that Decedent "successfully passed a physical examination . . . prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer." 77 P.S. § 414.

Employer also asserts that the WCJ granted relief under Sections 301(f), 108(r), 301(c)(1), and 301(c)(2) of the Act without finding the specific carcinogen to which Decedent was exposed, whether firefighting actually caused Decedent's cancer, or whether kidney/esophageal cancer rates are higher among firefighters compared to the general population.

At the outset, Section 301(c) of the Act provides, in relevant part:

> (1) The terms "injury" and "personal injury," as used in th[e A]ct, shall be construed to mean an injury to an employe, regardless of his previous physical condition,

13

except as provided under [Section 301(f) of the Act], arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury; and wherever death is mentioned as a cause for compensation under th[e A]ct, it shall mean only death resulting from such injury and its resultant effects, and occurring within [300] weeks after the injury. . . .

(2) The terms "injury," "personal injury," and "injury arising in the course of his employment," as used in th[e A]ct, shall include, unless the context clearly requires otherwise, occupational disease as defined in [S]ection 108 of th[e A]ct: [p]rovided, . . . . The provisions of this paragraph (2) shall apply only with respect to the disability or death of an employe which results in whole or in part from the employe's exposure to the hazard of occupational disease after June 30, 1973[,] in employment covered by [the Act]. The employer liable for [WC] provided by [S]ection 305.1 [of the Act] or [S]ection 108, subsection[]. . . (r) [of the Act], shall be the employer in whose employment the employe was last exposed for a period of not less than one year to the hazard of the occupational disease claimed. In the event the employe did not work in an exposure at least [1] year for any employer during the [300] hundred week period prior to disability or death, the employer liable for the [WC] shall be that employer giving the longest period of employment in which the employe was exposed to the hazards of the disease claimed.

77 P.S. § 411. As stated above, Section 108(r) of the Act defines an "occupational disease" to include "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the [IARC]." 77 P.S. § 27.1(r).

The Pennsylvania Supreme Court has explained:

The nature of the evidence necessary to establish an "occupational disease" under Section 108(r) of the Act differs markedly from the nature of the evidence that an employer must present to rebut the evidentiary presumption of employment-related causation. Unlike the

14

proof required under Section 108(r) [of the Act], the employer may not rebut the evidentiary presumption with generalized epidemiological evidence that [the] claimant has a type of cancer that may (or may not) possibly be caused by a Group 1 carcinogen. As indicated, **epidemiological studies merely identify statistical associations between disease and potentially causative agents in broad populations**, **and thus do not provide any evidence demonstrating the specific cause of a particular claimant's cancer**. To reach the stage of the proceedings at which the employer attempts to rebut the presumption of employment-related causation, **the claimant has already carried his or her Section 108(r) [of the Act] burden of proof that his or her cancer is of a type that *may* be caused by a Group 1 carcinogen**. The employer may not rebut the evidentiary presumption merely by revisiting this determination and challenging its accuracy. At the rebuttal stage, the issue relates not to "types of cancer" relative to potential carcinogens, but rather requires proof of [sic] that the cancer from which the claimant suffers was not caused by his occupation as a firefighter.

*Sladek*, 195 A.3d at 209-10 (footnote omitted; bold and italic emphasis added).

Here, the WCJ determined:

**Adenocarcinoma of the esophagus is the type of cancer possibly caused by IARC Group [1] carcinogens and** is the cancer that **caused Decedent's death**.

[] **Decedent** served four or more years in continuous firefighting duties, **had direct exposure to a Group [1] carcinogen** and passed a physical examination prior to asserting a claim or prior to engaging in firefighting duties (and the examination failed to reveal any evidence of cancer).

WCJ Dec. at 16-17 (emphasis added). Because this finding is based on Dr. Guidotti's, Claimant's, and Leszczynski's testimony, and Exhibit C-6, Decedent's Incident Response Report, this finding is sufficient under *Sladek* to satisfy Claimant's burden under Sections 301(f), 108(r), 301(c)(1), and 301(c)(2) of the Act.

15

Finally, Employer argues that the Board erroneously affirmed the WCJ's one-sentence finding overruling numerous preserved objections with no explanation or analysis.

Preliminarily, the WCJ ruled: "The preserved objections of **both parties** are overruled." WCJ. Dec. at 17 (emphasis added). The Board explained:

> [Employer] asserts that the WCJ summarily rejected its objections to lay and medical testimony that was speculative and lacked foundation. In Finding of Fact No. 18, the WCJ overruled the preserved objections of both parties. Admission of evidence is committed to the sound discretion of the WCJ. *Atkins v. W[orkers'] C[omp.] A[ppeal] B[d.] (Stapley in Germantown)*, 735 A.2d 196 (Pa. Cmwlth. 1999). An abuse of discretion occurs where the WCJ's judgment is manifestly unreasonable, the law is not applied or the record shows partiality, bias or ill will. *Allegis Gr[p.] v. W[orkers'] C[omp.] A[ppeal] B[d.] (Coughenauer)*, 7 A.3d 325 (Pa. Cmwlth. 2010). Our review of the testimony and [d]ecision reveals no indication of manifestly unreasonable judgment or inaccurate application of the law.

Bd. Dec. at 24. A review of the specific objections Employer references in its brief appear to go to the weight and credibility of the witnesses' testimony. *See* Employer Br. at 59-64. "The WCJ, as the ultimate fact[-]finder in [WC] cases, has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part. The WCJ may reject even a witness's uncontradicted testimony." *Mercer*, 317 A.3d at 695 (citation omitted). Accordingly, the Board properly affirmed the WCJ's finding overruling the preserved objections.

For all of the above reasons, the Board's decision is affirmed.

_____
ANNE E. COVEY, Judge

Judge Dumas did not participate in the decision in this matter.

16

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Upper Merion Township VFD,     :
            Petitioner     :
                   :
         v.              :
                   :
James Dolga c/o Therese Dolga     :
(Workers' Compensation Appeal     :
Board),                     :     No. 1638 C.D. 2024
            Respondent     :

## O R D E R

AND NOW, this 3rd day of November, 2025, the Workers' Compensation Appeal Board's November 8, 2024 order is affirmed.

_____

ANNE E. COVEY, Judge